Filed 6/26/13  P. v. Hutt CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054442 |
| v. | (Super.Ct.No. RIF123535) |
| KENNETH SHERWOOD HUTT, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey Prevost, Harry A. Staley, and Thomas Kelly, Judges.\* Affirmed with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

---

\* Judge Staley is a retired judge of the Kern Superior Court and Judge Kelly is a retired judge of the Santa Cruz Superior Court.  Both were assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Steven T. Oetting and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendant Kenneth Sherwood Hutt was convicted of several sex offenses against two girls, 16-year-old Doe 1 and 10-year-old Doe 2. He appeals, claiming insufficient evidence supports his convictions involving Doe 2, and raising numerous additional claims of error. We strike a $70 fine that the parties agree was erroneously imposed. We also amend the judgment to award defendant 2,646 days of presentence custody credits which the parties agree were inadvertently omitted from the sentencing order. In all other respects, we affirm the judgment.

The crimes against Doe 1 and Doe 2 were committed on separate occasions in 2005 and the victims did not know each other. The crimes against Doe 1, kidnapping to commit rape (Pen. Code, § 209, subd. (b); count 1)[1] and rape in concert (§ 264.1, subd. (a); count 2), occurred on February 18, 2005. The crimes against Doe 2 occurred on May 9, 2005, and consist of attempted kidnapping to commit rape, etc. (§§ 664, 209, subd. (b); count 3), attempted enticement of a child under 14 years of age to commit a lewd act (§§ 664, 207, subd. (b); count 4), attempted lewd act on a child under 14 years of age (§§ 664, 288, subd. (a); count 5), and unlawfully annoying a child under 18 years of age

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

(§ 647.6, subd. (c)(1); count 6). Defendant was also convicted of possessing child pornography, a misdemeanor, based on a search of his computer. (§ 311.11; count 7.)

The verdicts in counts 3 through 7 were rendered following a November 2006 jury trial. A mistrial was declared on counts 1 and 2 after the jury deadlocked on those counts. In 2010, a second jury also deadlocked on counts 1 and 2 and another mistrial was declared. Following a third jury trial in May 2011, defendant was found guilty of kidnapping for rape in count 1 and rape in concert in count 2. In the first and second trials, defendant was charged with forcible rape in count 2 (§ 261, subd. (a)(2)), but before the third trial, the information was amended to charge him with rape in concert in count 2.

For the rape in concert of Doe 1 in count 2, defendant was sentenced to 15 years to life under the "One Strike" law. (§ 667.61, subds. (b), (c)(3), (e)(1).) Sentence on count 1, the aggravated kidnapping of Doe 1, was stayed. On count 3, the attempted aggravated kidnapping of Doe 2, the court imposed a nine-year term, and stayed sentence on counts 4 through 7. Defendant was accordingly sentenced to an aggregate term of 9 years plus 15 years to life.

## II. FACTUAL BACKGROUND

A. *Prosecution Evidence*

### 1. February 18, 2005 (Doe 1; Counts 1 & 2)

On February 18, 2005, Doe 1 was a 16-year-old student at Arlington High School in Riverside. She stayed after school that day to watch a soccer game, and left the soccer

3

game around 5:00 p.m. as it was getting dark. She was on the sidewalk in front of the school auditorium, about to begin walking home, when a white van with a bubble top pulled up alongside her. The passenger side of the van was nearest to her. There were two men in the van, and the passenger asked Doe 1 if she knew where the school auditorium was.

In response to the passenger's question, Doe 1 turned around and pointed to the auditorium. As she did so, someone grabbed her arm and pulled her into the back of the van. Doe 1 was screaming. In the back of the van, she could see the passenger's face in front of her as she lay on her back. She felt the van begin to move. Defendant held Doe 1's hands above her head with one hand, pulled her pants down to her knees with his other hand, and put his penis inside her vagina without her consent. Defendant never said anything to Doe 1 before or after the rape. Doe 1 did not know whether defendant ejaculated.

Doe 1 was eventually able to kick defendant in the thigh, open the van doors, and run away. When she got out of the van, she found herself in an orange grove near her home. She ran through the orange grove and across Van Buren Boulevard to a street called Canyon Ridge Road. There, she ran up to one of the houses and fainted on the porch.

Around three months after the rape, Doe 1 identified defendant in a photographic lineup as the passenger, and identified him at trial as the passenger and man who raped her. At trial, she was "a hundred percent sure" and there was "[n]o doubt" in her mind

4

that defendant was the man who raped her. She described the rapist as having short blonde hair, a mustache, blue eyes, and standing approximately six feet two inches in height.

Michael McFarlin lived on Canyon Ridge Road on February 18, 2005. That evening, McFarlin was going to take his son to a karate lesson at approximately 6:30 p.m. As McFarlin went out the front door of his house, he saw a young woman lying face down on his front porch, and he immediately called 911. The young woman was unconscious and McFarlin was unable to wake her. She was disheveled—her shirt was a mess, her pants were undone and she was soaking wet because it had been raining. McFarlin recognized the young woman as someone who lived in the neighborhood.

Marlene Mitchell (Marlene) knew defendant because he used to work as an employee for her ex-husband, William Mitchell (William). According to Marlene, defendant and William were close friends and were "like brothers." In 2004, defendant lived with the Mitchells in Murrieta, and in January 2005 defendant moved into the Mitchell's garage when the Mitchells moved to Hemet. William used cargo vans in his business, and defendant was authorized to drive those vehicles. Defendant and William would drive together in William's vehicles to swap meets and auctions. Marlene also saw defendant drive a van owned by Matt Hickman, a business acquaintance of William. William had another employee, Victor Manuel Balderama, who was also authorized to drive William's vehicles. Balderama once received a ticket while driving a white 1988 GMC van registered to William.

5

Marlene had known defendant for many years, and during that period defendant had often changed his hairstyle. He sometimes wore it long; at other times he would cut it short and dye it blonde. Marlene was familiar with the orange groves near Van Buren Boulevard. Defendant once told her that he liked to take the back ways in Riverside and the orange grove was one of his favorite places. William and defendant would sometimes sell at a swap meet off Van Buren Boulevard.

2. <u>May 6 and May 9, 2005 (Doe 2; Counts 3-6)</u>

On Friday, May 6, 2005, Abelino Martinez was a school maintenance worker at the Riverside County Office of Education in Riverside, across the street from Grant Elementary School. At 8:00 a.m., Martinez saw a van parked in front of the fence surrounding the elementary school. He went over to the parking area and asked the man sitting in the van, whom he identified in court as defendant, whether he had any business at the education office. When defendant said he did not, Martinez told him to leave. Defendant was very nice, and he left.

Around 8:00 a.m. on Monday, May 9, 2005, Martinez saw defendant parked in his van in front of the school again, near the swings. He asked defendant to move, and defendant did so. Later, around 10:00 a.m., Martinez saw defendant parked in the area in front of the soccer field. He asked defendant to move again, and defendant did so.

During the afternoon of May 9, 2005, 10-year-old Doe 2 was playing with two boys, her brother and her brother's friend, in the schoolyard at Grant Elementary School.

6

Both boys were nine years old. Doe 2 and the boys were supposed to be in school that day, but they were not.

As Doe 2 and the boys were playing, Doe 2 saw a white van with stripes parked in front of the school. Defendant, whom Doe 2 identified as the driver, got out of the van, walked toward the fence, and began talking with the boys. Doe 2 walked toward her brother. When she heard her brother talking with defendant, she told her brother to get away. She heard defendant say, "'I will drive you to your house if you want,'" and she told her brother to tell defendant "'[n]o.'" The boys then started climbing a rock wall, and defendant got back in his van and drove toward a nearby gas station. Doe 2 also heard defendant telling her brother and his friend to be careful when they started climbing the rock wall.

After defendant drove toward the gas station, Doe 2 started climbing the rock wall and told her brother and his friend to get down from the wall so they could leave. After driving to the gas station, defendant got out of the van and approached the fence surrounding the schoolyard. Defendant threw approximately 10 sticks at Doe 2 and the boys, and said to them, "'Come up here. I'm going to take you to McDonald's and bring you home.'"

Doe 2 did not go up to where defendant was because she was afraid he would take them, rape them, and kill them. On May 9, 2005, Doe 2 did not tell an interviewing police officer about defendant's statement about McDonald's. She also said defendant threw only one stick. When the police were talking to Doe 2 and the boys, defendant was

7

still standing near the schoolyard fence, and there was an opening or hole in the fence. Defendant did not attempt to get through the opening in the fence in order to get to the same side of the fence as the children.

In May 2005, Ronald Crothers also worked at the education building in Riverside, across the street from Grant Elementary School. There was a parking lot adjacent to the school, across from Almond Street. On May 9, 2005, as Crothers was eating lunch on the fourth floor of the education building, he saw a man hanging out in the parking lot who did not look right. As Crothers continued to eat, he kept his eye on the man for several minutes. He could see that the man was slim and had gray hair. He also saw a van in the parking lot that did not look familiar. The man was hanging out next to the fence in the area near an embankment. The man moved toward the fence after three children appeared near the embankment in the schoolyard area. It looked like the man was speaking to or calling to the children. Crothers saw that one of the children came closer to the fence.

Concerned by what he saw, Crothers went downstairs to see what was going on in the parking lot. On his way to the parking lot, Crothers ran into Martinez, the maintenance man, who told him he would look into the matter. As Martinez approached defendant's van, he saw that three children—two boys and a girl—were playing in the school playground and that defendant was sitting behind the steering wheel of the van, masturbating as the children played "almost directly in front of where [defendant] was

8

parked." Defendant was startled, and Martinez told defendant either, "'You got to leave'" or "'Get out of here.'" Defendant quickly drove away.

Around 2:00 p.m. on May 9, 2005, Riverside Police Officer Dennis Causey arrived at the Thrifty gas station on the corner of Market Street and 14th Street in Riverside, in response to a dispatch concerning a suspicious person in a van bothering children. Officer Causey saw a van in the parking lot of the gas station, and an "older male, [with] white hair," who matched the description of the suspicious person, and whom he identified in court as defendant, walking away from the van.

As Officer Causey approached, defendant said, "'I didn't do anything wrong.'" The officer then asked defendant whether he had been driving the van, and defendant responded, "'Yes.'" When asked whether he had been approached by someone and told to move, defendant said "'No.'" But when asked whether he was sure about this, defendant said he had been asked to move and he had done so.

As Officer Causey checked defendant's person and put defendant's hands behind his back, defendant tried to pull away. Officer Causey detained defendant and placed him in the back of his vehicle. After other officers spoke with Doe 2 and the two boys, defendant was taken to the police station where he waived his *Miranda*[2] rights and agreed to be interviewed. During the interview, defendant told Officer Causey that he lived in Hemet with his boss and his wife and had no association with anyone in Riverside.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

9

When asked why he was in Riverside, defendant said he got off Interstate 60 at Market Street and was going to get gas. He was tired and planned to sleep in a park.

Defendant also said he parked at Grant Elementary School and was watching some children play soccer. Then he got out of his van and was watching three children playing in the field in front of his van. He denied speaking with the children. When asked whether he was sure he had not spoken to the children, defendant said he saw the female child slide up and down a hill on the grass, and he told her to be careful. He told the children to "'[b]e careful,'" "'[d]on't fall,'" "'I don't want you to fall and get hurt,'" and "'[d]on't fall off the fence.'" When asked whether he had been doing anything offensive in his van, defendant said, "'I may have. I don't remember.'" He also said he moved when he was asked to move.

Officer Causey then asked defendant whether he had parked in the parking lots near the school earlier that day. He said he was confused and initially denied being at the school earlier that day, then he said he might have been in the school parking lot around 9:00 that morning. He also said he had been in the area of the school around four months earlier. He told Officer Causey, "'If I knew there was a grade school, I would have never been within 1,000 miles.'"

Riverside Police Officer Anthony Fletcher met Officer Causey at the Thrifty gas station on May 9, 2005, where Officer Causey had a male subject detained in the backseat of his vehicle. Officer Fletcher looked inside a van parked to the rear of the gas station. On the front seat of the van, Officer Fletcher found a black cat with a cartoon

10

figure or cartoon tie wrapped around it, and a Christmas stocking with a cartoon character on it. Officer Fletcher also recovered a green squirt gun, 13 cartoon videotapes, and four pens from the van.

William testified at defendant's first trial in 2006, and had known defendant for the previous 13 or 14 years. In February and May 2005, defendant lived with William, his then-wife Marlene, and their three daughters in Hemet. Defendant occasionally used the Mitchell family's computer in the house, but defendant stayed in the garage. In the garage, he slept on a mattress and had an entertainment center, including a television and videotape and DVD equipment. He also had pornographic videotapes.

William saw defendant viewing pornography on his television, and spoke with him about it. William did not want his children to see that type of material, and his wife was pressing him on the subject. The matter had become a point of stress between William and Marlene, and William almost asked defendant to move out over the issue. Marlene saw defendant looking at pornography on the home computer on the Mitchell's kitchen table. William denied viewing child pornography and/or using his computer to view such material. William never saw defendant with any child pornography in the garage or in his house.

William was in the business of selling electronics, antiques, and other items at swap meets and flea markets. He bought computers in bulk, and defendant would work on and fix the computers in the garage. In connection with that business, William owned and used vans which he stripped of their rear seats. Hickman was a friend of William's

11

who had a white Ford van with stripes. Hickman loaned this van to William in 2005, and this was the van defendant was driving when he was arrested in May 2005.

On Friday, May 6, 2005, defendant was at the Mitchell's house when William left for work around 8:00 a.m. William believed defendant returned home around noon that day. Before Monday, May 9, 2005, the last time William had seen defendant was during the evening of Saturday, May 7. William was ill that Saturday, and asked defendant to sell for him at the Melrose Trading Place. According to Marlene, defendant was at the Mitchell home on the morning of Friday, May 6, 2005, except for a short time when he went to Walmart to get Marlene a diet soda. Defendant worked on eBay after he returned from Walmart. Officer Causey testified that, when he telephoned Marlene and asked her whether defendant had been at the Mitchell house on Friday morning, May 6, 2005, Marlene was evasive. Officer Causey then overheard Marlene shout to William, "'You tell him that he was here, 'cause I'm not going to get in trouble.'"

3. Count 7 (Possession of Child Pornography)

During a search of the Mitchell home, detectives found "thousands" of pornographic photographs on defendant's computer, much of it pornographic images of preteen and teenage children.

B. *The Prior Sexual Battery Offenses Against Two Adult Women in 1992 and 2001*

1. Doreen H. (1992)

In 1992, Doreen H. lived in Rialto, California. On May 2, 1992, Doreen was taking her daily walk in her neighborhood when she saw defendant on the other side of

the road walking toward her. Defendant was grinning at Doreen, but she did not recognize him. Doreen looked away and continued walking.

After walking about half a block further, Doreen heard defendant mumbling about three feet behind her. Doreen stepped to the inside edge of the sidewalk and stopped, hoping that defendant would pass by her. Defendant did not pass by Doreen, but stopped and said, "'I've got something for you,'" and exposed his penis.

Next, defendant grabbed Doreen's breasts, said "'[g]ive me your tits,'" and tried to pull her into the bushes. Doreen pushed defendant's hands away and ran. Defendant fled down a side street. Doreen saw a police car on a nearby street and flagged down the officers. One of the officers detained defendant, and Doreen identified defendant at the scene and at trial as the man who exposed himself to her, grabbed her, and tried to pull her into the bushes.

2. Kathleen L. (2001)

In 2001, Kathleen L. lived in Homeland, around eight miles from Hemet, and was using a wheelchair. On July 1, 2001, at approximately 11:30 p.m., Kathleen was on the corner of Highway 74 and Amanda Lane, trying to get home in her wheelchair. She had been at a nearby AM/PM store and had gotten into a fight with her girlfriend. She left without her ride and was trying to make it the four miles to her home on her own.

As she was wheeling along the road, Kathleen saw a van. Defendant, the driver, got out of the van and asked Kathleen whether she needed a ride or any help. She told defendant she would be okay, but defendant insisted he could take her home, and told her

13

not to be afraid.  Defendant opened the door of the van and helped Kathleen get inside.  There were no seats in the rear of the van, only boxes.

After defendant got into the van, he reached over and touched Kathleen's breast.  She told him "no," and he proceeded to drive.  When he began to drive the wrong way, Kathleen told him it was not the way to Homeland.  Defendant then pulled over, reached over, and touched Kathleen's breast again.  Kathleen saw a screwdriver, picked it up, and said, "'You touch me again, I'm going to stab you.'"  "'You're not going to touch me where I don't want to be touched, and if you don't want to get touched the same way, then don't touch me.'"  "'Take me home . . . .  [¶]  . . .  [¶]  [or] let me out.'"

Defendant apologized and told Kathleen he would take her home.  Kathleen gave defendant directions, and he drove her back to her house.  Defendant kissed Kathleen on the forehead as he helped her out of the van.  Kathleen reported the incident to the police.

At the first and third trials, the parties stipulated that in 1992 and 2001, defendant admitted one count of misdemeanor sexual battery involving Doreen, and one count of felony sexual battery involving Kathleen.  In the third trial, the parties further stipulated that on November 9, 2006 (following the first trial), defendant was convicted of "attempted kidnapping, three counts of attempted lewd acts with a children [*sic*] under 14 years of age, and annoying and molesting a child under 18 years of age, involving [Doe 2]."

14

C. *Dr. Craig Rath's Expert Testimony on Paraphilias*

Dr. Craig Rath, a clinical and forensic psychologist, testified on the subject of paraphilias for the prosecution. His testimony is detailed below.

D. *Defense Evidence*

Cheryl Maier was employed as a Sexual Assault Response Team (SART) nurse at Rancho Springs Medical Center on February 18, 2005. On that date, she examined Doe 1. Doe 1 told Maier that she had been raped in the back of a white van with gray interior. She described two men, ages 35 and 45, as being involved. Doe 1 was unsure whether her attacker had ejaculated or whether any contraception or lubrication had been used.

Maier also conducted an examination of Doe 1 with a Wood's lamp, which is an ultraviolet light source that highlights anything on the body that fluoresces. There was an area that fluoresced across Doe 1's upper chest. Maier also took four vaginal swabs and three slides, drew blood, and took a urine sample from Doe 1. In her findings, Maier noted that she viewed what appeared to be nonmobile sperm on the "vaginal sperm wet mount."

E. *Rebuttal Evidence*

David Wu, a senior criminalist with the California Department of Justice Bureau of Forensic Services, worked in the serology and DNA services section. Wu analyzed several items of evidence, including a sexual assault kit and several articles of clothing, in connection with Doe 1's case. Wu found that all of the items of clothing tested negative

15

for seminal fluid, including a black sweatshirt, denim pants, a white bra, a green shirt, and a blue camisole top.

Wu tested the swab from Doe 1's chest for saliva, but the test was inconclusive because the enzyme present in saliva is also present in perspiration. The reading Wu obtained was so low that he could not determine whether it was saliva. Wu also doubted whether DNA could have been recovered from the small sample recovered from Doe 1's chest. Wu examined one of the four vaginal swabs provided to him. There were no signs of sperm cells on the slide, and there was no seminal fluid detected on the swab.

Long blonde hairs, multicolored hair, and white hairs were recovered from some of Doe 1's clothing. No DNA analysis was done on any of the hairs because none of the hairs contained root material from which DNA could be extracted. According to Wu, the multicolored hairs were animal in origin. Wu also did not perform any type of microscopic hair comparison between the hairs found on the clothing and a sample of defendant's hair because this type of analysis does not provide particularly strong evidence due to variations in hair even from the same person.

### III. DISCUSSION

A. *Substantial Evidence Supports Defendant's Attempted Kidnapping and Attempted Lewd Act Convictions in Counts 3, 4, and 5*

Defendant claims that insufficient evidence supports his attempted kidnapping and attempted lewd act convictions in counts 3, 4, and 5. We conclude that substantial evidence supports each of the attempt convictions.

16

In determining whether sufficient evidence supports a conviction, "the relevant question [on appeal] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) We "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) The same standard of review applies when the conviction is based largely on circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"'Substantial evidence must support each essential element of an offense. A judgment of conviction will not be set aside for insufficiency of the evidence to support the jury's verdict unless it is clearly shown there is no basis on which the evidence can support the conclusion of the jury. The credibility of witnesses and the weight to be accorded to the evidence are matters to be determined by the trier of fact. [Citations.]'" (*People v. Cardenas* (1994) 21 Cal.App.4th 927, 938.) Reversal of the judgment is thus unwarranted "[e]ven if we might have made contrary factual findings or drawn different inferences, . . . [as] it is the jury, not the appellate court, that must be convinced beyond a reasonable doubt." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

Defendant was convicted in count 3 of attempting to kidnap Doe 2 for the purpose of raping or committing a lewd act on her. (§§ 664, 209, subd. (b).) An attempt to

commit an aggravated kidnapping—here, kidnapping for the purpose of, for example, rape or a violation of section 288—requires a specific intent to kidnap the victim for the purpose of committing the rape or violation of section 288. (See *People v. Mullins* (1992) 6 Cal.App.4th 1216, 1221 [attempted kidnapping to commit robbery requires a specific intent to kidnap victim to commit robbery].)

Defendant was convicted in counts 4 and 5 of attempted enticement of a child under 14 years of age to commit a lewd act (§§ 664, 207, subd. (b); count 4) and attempting to commit a lewd act on a child under age 14 (§§ 664, 288, subd. (a); count 5). "An attempt to commit a lewd act upon a child requires both an intent to arouse, appeal to, or gratify 'the lust, passions, or sexual desires of [the defendant] or the child' [citations] 'and . . . a direct if possibly ineffectual step toward that goal . . . .'" (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1322; see also *People v. Singh* (2011) 198 Cal.App.4th 364, 368.) The requisite intent to violate section 288, subdivision (a) may be proven by circumstantial evidence. (*People v. Levesque* (1995) 35 Cal.App.4th 530, 543.)

More generally, and as pertinent here: "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a; *People v. Davis* (2009) 46 Cal.4th 539, 606 (*Davis*).) "[T]he overt [or direct] act [toward the commission of the crime] must go beyond mere preparation and show that the [defendant] is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes

18

[citation], nor need it satisfy any element of the crime [citation]." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 8.)

Defendant argues that his attempt to lure Doe 2 into his van with the promise of taking her to McDonald's, then home, was at most an act in preparation to commit a lewd act, or to kidnap Doe 2 to commit a lewd act, and as such does not, as a matter of law, constitute a direct act toward the commission of attempted kidnapping to commit a lewd act, or an attempted lewd act. We disagree.

There is no uniform legal standard or formula for distinguishing every attempt to commit a crime from mere preparation to commit the crime. (*People v. Superior Court (Decker), supra,* 41 Cal.4th at p. 8; *People v. Memro* (1985) 38 Cal.3d 658, 699, overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) Still, it has long been recognized that, "'[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt . . . .'" (*People v. Superior Court (Decker), supra,* at p. 8, quoting *People v. Memro, supra,* at p. 698; see also *People v. Herman* (2002) 97 Cal.App.4th 1369, 1389 [discussing importance of evidence of intent in determining sufficiency of evidence of acts sufficient to constitute an attempt and going "beyond mere preparation"].)

Here, defendant's intent to kidnap Doe 2 in order to commit a lewd act on her was plainly shown. Defendant was observed watching children play in the Grant Elementary School playground on Friday, May 6, and again on Monday, May 9. On the morning of May 9, he was twice asked to leave the area and did so, but returned during the afternoon.

19

That afternoon, defendant drove up in a white van and began talking to Doe 2, her brother, and another young boy on the school playground. After throwing sticks and a rock to get the children's attention, defendant said, "'Come up here. I'm going to take you to McDonald's and bring you home.'" After Doe 2 refused the offer, defendant drove away in his van. Before he drove away, he was observed masturbating in the driver's seat of his van while the children were playing not far from the front of the van.

Defendant also had a history of accosting strangers and committing lewd acts on them, both in public places and in his van. In 1992, he exposed himself to Doreen H. as she was walking on a public sidewalk. In 2001, he lured Kathleen L. into his van under the guise of giving her a ride home, and fondled her breasts.

Based on defendant's history of committing lewd acts in public and in his van, and his act of masturbating in his van while watching children near the time he offered Doe 2 a ride, defendant's attempt to lure Doe 2 into his van under the guise of taking her to McDonald's, then home, constituted a direct act toward the commission of kidnapping Doe 2 for the purpose of raping or committing a lewd act on her. (§ 21a.)

Relying on *People v. La Fontaine* (1978) 79 Cal.App.3d 176 (*La Fontaine*), disapproved on other grounds in *People v. Lopez* (1998) 19 Cal.4th 282, 292, defendant argues that his act of offering Doe 2 a ride in his van, without more, at most constitutes a solicitation to commit a lewd act and, as such, is insufficient to constitute an attempt. In *La Fontaine*, the victim, a 13-year-old boy, accepted a ride from the defendant, and the defendant asked whether he wanted to make an easy $5 or $10. In response to the boy's

20

question how, the defendant responded, "'I give you a blow job.'" (*La Fontaine, supra,* at p. 179.) The boy said no, and got out of the defendant's car. (*Ibid*.) The defendant never touched the boy or "ma[d]e any movement or motion" toward the boy. (*Id*. at p. 180.) The court concluded that the defendant's conduct of verbally soliciting the boy, without more, was an act of solicitation and, as such, was insufficient to constitute an attempt to commit a lewd act. (*Id*. at pp. 182-183.) The court established a bright-line rule that "acts of solicitation constitute preparation only and do not rise to the level of the offense of a criminal attempt." (*Id*. at p. 183; §§ 664, 288, subd. (a).)

Although *La Fontaine* supports defendant's argument, the case has not been followed in published decisions, and this court and others have questioned its bright-line, categorical rule that a solicitation can never constitute an attempt. (*People v. Ansaldo* (1998) 60 Cal.App.4th 1190, 1196 [Fourth Dist., Div. Two] [declining to follow *La Fontaine* and questioning the soundness of its rule in light of the state Supreme Court's 1985 decision in *People v. Memro, supra,* 38 Cal.3d 658]; *People v. Herman, supra,* 97 Cal.App.4th at p. 1387 [concluding, "[w]e do not believe the categorical rule adopted in *La Fontaine* is sound in its own right or constitutes a correct statement of California law"].) Indeed, since *La Fontaine* was decided in 1978, the state Supreme Court has repeatedly emphasized that there is no set standard for distinguishing every attempt to commit a crime from preparation, and evidence of the defendant's criminal intent and history are important factors to consider in determining whether the defendant's words or

actions constitute an attempt.  (*People v. Superior Court (Decker), supra,* 41 Cal.4th at pp. 8-9; *People v. Memro, supra,* at p. 699.)

Still, defendant suggests that the rule of *La Fontaine* should be followed here "[o]n the substantive issue of sufficiency."  He points out that his conduct "was even less direct and overt than that found insufficient in *La Fontaine*" because he "did not suggest any type of sexual activity in speaking with [Doe 2] or her companions."  This argument focuses exclusively on defendant's seemingly innocuous offer to take Doe 2 and the boys to McDonald's, and his failure to make any type of movement toward the children— despite the break in the fence separating him from the children.  The argument fails because it disregards the evidence that defendant intended to commit and would have committed a lewd act had his offer been accepted.  That defendant was masturbating in his van while watching the children, together with his history of committing lewd acts on strangers both in his van and in public places after smiling or purporting to be friendly, strongly indicated that he intended to commit a lewd act had his offer been accepted. (*People v. Memro, supra,* 38 Cal.3d at p. 699 [finding sufficient evidence of an attempt to commit a lewd act based on the defendant's entire course of conduct, confessed intent, and prior history].)

B.  *The Expert Testimony of Dr. Craig Rath*

Defendant claims his convictions in counts 3 through 6—the crimes involving 10-year-old Doe 2—must be reversed because the expert testimony of Dr. Rath was erroneously admitted in his first trial.  The testimony was offered to dispel any notion the

22

jurors may have had that men who are sexually interested in adult women are not also sexually interested in young girls.

We conclude that to the extent Dr. Rath was allowed to testify concerning some of the more extreme forms of paraphilias, such as zoophilia or a sexual attraction to animals, the testimony was not relevant to whether men can be sexually interested in adult women and young girls, and was therefore erroneously admitted. Nonetheless the error was harmless under any standard.

1. Background/Pretrial Proceedings

Before trial, the prosecution moved to admit evidence that defendant committed prior sex offenses against two adult women, Doreen H. and Kathleen L., in 1992 and 2001. The defense argued the prior crimes evidence was irrelevant and unduly prejudicial because it involved adult women, and the alleged victims of the charged offenses were young girls, ages 16 and 10. The court ruled that the 1992 and 2001 prior crimes evidence was admissible to show that defendant had a propensity to commit sex crimes (Evid. Code, § 1108) and to show, among other things, that defendant intended to molest 10-year-old Doe 2 when he offered her a ride on May 9, 2005 (Evid. Code, § 1101, subd. (b)).

The prosecution also moved to admit the expert testimony of clinical and forensic psychologist Dr. Rath, for the purpose of dispelling the defense claim and any notion the jurors may have, that a person who is sexually interested in adult women cannot also be

23

sexually interested in younger girls.  Defense counsel objected to Dr. Rath's proposed testimony as irrelevant and unduly prejudicial.

Following an Evidence Code section 402 hearing in which Dr. Rath testified outside the presence of the jury, the court ruled that the doctor's proferred testimony was relevant and not unduly prejudicial to the extent he would generally explain the nature of paraphilias, or sexual deviancies, and polymorphous perversion or multiple sexual deviancies, and that a person who is interested in adult women can also be interested in children if power and control is a common element.  The court ruled, however, that any testimony concerning "fetishes" or "some of the more extreme paraphilias" or sexual deviancies that the doctor described were not relevant to any disputed issue in the case and would be unduly prejudicial.

2. Dr. Rath's Trial Testimony

In defendant's first trial, Dr. Rath testified that "paraphilias" are a family of diagnoses that include objects and situations a person might find sexually arousing and that are deviant or different from the norm.  The word "paraphilia" literally means "the love of that which is beyond normal."  One example of paraphilia is pedophilia, a sexual attraction to prepubescent children.  Another example is hebephilia, a sexual attraction to children who are "just sexually developing," usually girls between the ages of 11 and 14.  Still another example is hebepedophilia, a sexual attraction to both prepubescent and sexually developing children.

24

Dr. Rath explained that if a person has one type of paraphilia or one "different or deviant sexual attraction," the person is likely to have other paraphilias. Indeed, some paraphilias are highly correlated. For example, sadism, or sexual pleasure from inflicting pain, is highly correlated and "go[es] hand in hand" with sexual masochism, or sexual pleasure from receiving pain. In addition, no sexual deviations are mutually exclusive of one another, and a person with many "different types" of paraphilias is said to be "polymorphously perverse."

When asked whether there is a specific term or diagnosis for someone who has "different" types of paraphiliac or sexually deviant interests, the doctor said "no," and explained that the "more unusual" or "rarer" paraphilias are diagnosed as "paraphilia not otherwise specified." These include "zoophilia, or sexual attraction to animals. Urophilia, sexual behavior involving urine. Corprofilia involving feces. Necrophilia involving dead bodies." The doctor further explained that a person can have a large number of paraphilias, but "you reach the point where you just diagnose paraphilia and not otherwise specified . . . multiple deviations."

When asked how common or uncommon it is for a paraphiliac to be attracted to prepubescent and pubescent children and adult women at the same time, Dr. Rath responded that "[m]ost individuals are of the nonexclusive type, meaning that someone who is attracted only to children would be unusual compared to someone who is attracted to children and adults at the same time. A pure . . . hebepedophiliac would be unusual." The doctor explained that "control and power or domination" is "a very common

25

dynamic" or common element in paraphilias. Paraphilias also tend to be lifelong or chronic, and the question is whether the person acts on them. Not everyone who commits a sexual assault suffers from a paraphilia, however.

Dr. Rath had never met with or evaluated defendant, and emphasized that nothing he said should be understood as an opinion that defendant had any paraphilias. The doctor explained that "sometimes in legal cases where there's a technical matter involved, a jury might benefit from understanding a little fuller the terms and ideas for them to use in their deliberations."

### 3. Closing Argument

In closing argument, defense counsel stressed that defendant's prior offenses were committed against adult women, and men who are sexually interested in adult women are not also interested in younger girls. In rebuttal, the prosecutor told the jury, "Dr. Rath was put on to educate you that it is not uncommon for a predator to attack women and children with the same motive. That's why Dr. Rath was put on, so that you were not fooled into believing that because they are women versus children it cannot be the same man."

### 4. Analysis

Defendant first argues that Dr. Rath's testimony was "not [even] relevant" to any disputed issue in the case, given that the doctor did not examine defendant, and did not testify that defendant suffered from any paraphilias, including pedophilia or hebephelia. We disagree.

26

All expert opinion testimony is subject to the requirement that it be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ."  (Evid. Code, § 801, subd. (a); *People v. Guerra* (2006) 37 Cal.4th 1067, 1118.)  The court's determination that a subject is a proper one for expert opinion is reviewed on appeal for an abuse of discretion.  (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1110.)  Here, the court reasonably determined that Dr. Rath's testimony was relevant and admissible to counter the defense claim, and dispel any notion the jurors may have had, that men who are sexually interested in adult women are not also sexually interested in young girls.  The defense was claiming that the prior crimes evidence involving the adult women was irrelevant because it had no tendency in reason to show defendant was sexually interested in and or had a propensity to molest young girls (Evid. Code, § 1108), or that defendant intended to molest Doe 2 when he offered her a ride in his van (Evid. Code, § 1101, subd. (b)).  But Dr. Rath's testimony that a person who has one type of paraphilia or sexually deviant interest is likely to have others, that "control and power or domination" is a common element in many paraphilias, and that persons who are attracted to young children are usually attracted to adults at the same time, illustrated the relevancy of the prior crimes evidence to whether defendant had a propensity to commit similar sex crimes against women and girls generally, and intended to molest Doe 2 specifically.

Further, the probative value of Dr. Rath's testimony was not undermined because he did not meet with defendant or diagnose him as having any paraphilias.  Again, the

27

evidence of the prior offenses showed defendant engaging in controlling, sexually deviant criminal behavior against adult women, and the evidence in counts 3 through 6 showed defendant attempted to commit the same type of behavior with Doe 2, a 10-year-old girl. Dr. Rath's testimony showed that defendant's controlling, sexually deviant interests were not necessarily confined to adult women and could include young girls.

*Davis* is on point and instructive. There, Dr. Park Elliot Dietz gave a general description of paraphilia and described the behavior typical of persons who have the disorder. (*Davis, supra,* 46 Cal.4th at p. 605.) The court concluded that, *to this extent*, the doctor's testimony was properly admitted because it assisted the jury in understanding paraphilia, a subject """"sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.""" (*Ibid.*, citing *People v. Brown* (2004) 33 Cal.4th 892, 905 [prosecution may present expert testimony concerning battered women's syndrome]; Evid. Code, § 805.) Similarly here, Dr. Rath defined paraphilia for the jury, described its various types, and explained that a person who is sexually interested in adult woman can also be sexually interested in younger girls, particularly when the person suffers from several paraphilias and domination and control is a common element in the person's paraphilias.

Defendant next argues Dr. Rath's testimony should have been excluded under Evidence Code section 352 because it was unduly prejudicial. He argues the testimony "went beyond merely describing paraphilia in general and then a specific paraphilia possibly pertinent to the case." Thus, he claims Dr. Rath improperly suggested that he

28

suffered from any number of paraphilias, including ones having no basis in the evidence, and was polymorphously perverse based on these unspecified paraphilias.

We review a trial court's rulings under Evidence Code section 352 for an abuse of discretion. (*People v. Lee* (2011) 51 Cal.4th 620, 643.) Evidence is unduly prejudicial in the context of Evidence Code section 352 if it uniquely tends to evoke an emotional bias against a person, while having only slight probative value with regard to the issues. (*People v. Carter* (2005) 36 Cal.4th 1114, 1168.) Thus, evidence should be excluded as unduly prejudicial "'"when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]'" (*People v. Scott* (2011) 52 Cal.4th 452, 491; *People v. Rivera* (2011) 201 Cal.App.4th 353, 362.)

We agree that Dr. Rath's testimony concerning the more bizarre and extreme types of paraphilias, including zoophilia (sexual attraction to animals), urophilia (sexual activity involving urine), corprofilia (sex and feces), and necrophilia (sex with the dead), should have been excluded because it was irrelevant and *potentially* unduly prejudicial. (Evid. Code, §§ 210, 352.) These more extreme types of paraphilia indeed had no basis in the evidence. Nor was their discussion necessary to explain that there are many different types of paraphilia; that a person who suffers from one paraphilia is likely to suffer from another; or that domination and control is a common element or dynamic in

many paraphilias. The trial court pointed this out when, following Dr. Rath's testimony in the Evidence Code section 402 hearing, it ruled that any testimony concerning "fetishes" or "some of the more extreme paraphilias" were not relevant to any disputed issue in the case and would be unduly prejudicial.

Nonetheless, Dr. Rath's trial testimony concerning the more extreme types of paraphilias turned out not to be unduly prejudicial and was harmless under any standard. (See *Davis, supra,* 46 Cal.4th at p. 605.) Dr. Rath referred to these allegedly inflammatory types of paraphilias, which he described as "more unusual or rarer," in response to the prosecutor's question whether there was a specific term for a person who has "different" paraphiliac interests. Dr. Rath responded "[n]o," and explained that "[a]s we get to the more unusual or rarer paraphilias, there's a diagnostic category called paraphilia not otherwise specified. And that includes a number of different paraphilias that are more unusual. [¶] . . . So rather than have a bunch of different diagnostic numbers, they have this one category that encompasses the more unusual deviances."

Dr. Rath did not suggest, nor did any of the other evidence suggest, that defendant suffered from any of these "more unusual or rarer" types of paraphilias. Thus, contrary to defendant's claim, the doctor's brief references to these more unusual and rarer types of paraphilias did not "invit[e] . . . the jurors to speculate" that he suffered from any of them, or was polymorphously perverse based on any of them. In addition, Dr. Rath's testimony quickly turned to the issue he was called to give his expert opinion on: whether persons who are sexually interested in adult woman may also be interested in

30

young girls.  Based on all of the evidence, the jury could not have reasonably concluded that defendant had any extreme types of paraphilias.

Defendant's reliance on *People v. McFarland* (2000) 78 Cal.App.4th 489 (*McFarland*) is misplaced.  The court there concluded that Evidence Code section 1108 does not allow a psychiatrist called as an expert for the prosecution to render an opinion about the defendant's sexual proclivities during the prosecution's case-in-chief. (*McFarland, supra,* at p. 491.)  The court reasoned that although Evidence Code section 1108 permits the prosecution to prove a defendant's sexual propensity through specific instances of conduct, it does not alter Evidence Code section 1102's rule that opinion evidence concerning a defendant's character is inadmissible unless the defendant first places his character in issue.  (*McFarland, supra,* at pp. 491, 495.)

The defendant in *McFarland* was charged with violating section 647.6 (annoying or molesting a minor), when he stroked a four-year-old girl's arm and face in a public laundromat.  (*McFarland, supra,* 78 Cal.App.4th at pp. 491-492.)  The defendant had two prior felony convictions for lewd conduct with a child under 14 years of age.  To support his opinion that the defendant's conduct in the instant case was sexually motivated, the prosecution's expert psychiatrist, Dr. Mark Daigle, testified that the defendant had an unnatural or abnormal sexual interest in children when he stroked the girl's face.  (*Id.* at p. 492.)  Dr. Daigle's opinion was based on court documents and psychiatric reports from the defendant's prior convictions and the police report in the instant case.  (*Ibid.*)

The reports and documents showed that the defendant had a history of sexual dysfunction dating to his childhood, and reported having abnormal sexual relations with adults. (*McFarland, supra,* 78 Cal.App.4th at p. 492.) The defendant admitted engaging in "'infantile sexual behavior,'" such as exhibitionism and masturbating in public areas, and acknowledged being sexually attracted to prepubescent girls. (*Ibid.*) The reports also showed that the prior offenses involved seven- and eight-year-old girls, and described defendant's conduct with the girls as involving fondling, skin-to-skin contact, masturbation, and digital penetration. (*Ibid.*) Dr. Daigle characterized the defendant's "contact with children" as "'intermittent'" and "'impulsive,'" and opined that people with the defendant's type of sexual disorder are unlikely to recover spontaneously. (*Id.* at pp. 492-493.)

As the *McFarland* court pointed out, the problem with Dr. Daigle's testimony was that it was not limited to evidence of specific acts under Evidence Code sections 1108 and 1101, subdivision (b). (*McFarland, supra,* 78 Cal.App.4th at p. 495.) Instead, Dr. Daigle offered an expert opinion on the ultimate issue—that the defendant harbored an unnatural or abnormal sexual interest in the victim when he touched her arm and face in the laudromat. (*Ibid.*) Under Evidence Code section 1102, opinion evidence concerning a criminal defendant's character may only be offered by the prosecution in rebuttal to similar evidence presented by the defense. The defendant had presented no evidence about his character, rendering Dr. Daigle's opinion inadmissible under Evidence Code section 1102. (*McFarland, supra,* at p. 495.)

32

*McFarland* is plainly distinguishable because, unlike the expert in *McFarland*, Dr. Rath gave no opinion concerning defendant's character or proclivity to commit sex offenses. (*McFarland, supra,* 78 Cal.App.4th at p. 493 [character evidence may take the form of an opinion, reputation, or specific instances of the defendant's conduct].) To the contrary, Dr. Rath testified that nothing he said should be understood as an opinion that defendant suffered from any type of paraphilia. Instead, any suggestion that defendant suffered from paraphilias was based on the prior crimes evidence and the evidence of defendant's conduct in committing the current offenses.

Lastly, defendant argues Dr. Rath's testimony violated section 29, which prohibits an expert from testifying "as to whether the defendant had or did not have the required mental states [for the crimes charged], which include, but are not limited to, purpose, intent, knowledge, or malice aforethought . . . ." (*People v. Coddington* (2000) 23 Cal.4th 529, 582 ["[e]xpert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of the trial"].)

Here, however, Dr. Rath gave no opinion concerning whether defendant had or did not have the required mental state to commit any of the charged crimes. Instead, he defined paraphilia for the jury, gave examples of various types of paraphilias, and explained that domination and control is a common element in many paraphilias. He opined that a person who is sexually interested in adult women can also be interested in young girls—when domination and control is a common element in the person's

33

paraphilias.  The prior crimes evidence—not Dr. Rath's testimony—showed that defendant had sexual interests involving domination and control, and acted on those interests with adult women.  Dr. Rath's testimony was of assistance to the jury in resolving the disputed issue of whether defendant's interest in adult women meant he was not also interested in young girls.

C.  *The Prior Crimes Evidence Was Properly Admitted in the First and Third Trials*

In the first trial, the court admitted evidence of defendant's sexual batteries against Doreen H. in 1992 and Kathleen L. in 2001, for the purpose of showing that defendant intended to commit, and had a predisposition or propensity to commit, the charged crimes against Doe 1 and Doe 2.  (Evid. Code, §§ 1101, subd. (b), 1108.)  In the third trial on counts 1 and 2, the crimes involving Doe 1, the court again admitted the evidence of the 1992 and 2001 offenses, together with evidence of the crimes against Doe 2, to show that defendant intended to commit and was predisposed to commit the charged crimes against Doe 1.

Defendant claims the court abused its discretion and violated his right to a fair trial in admitting the prior crimes evidence in the first and third trials.  He argues that the 1992 and 2001 offenses were too remote in time to the charged offenses, and that all of the prior crimes evidence was too dissimilar to the charged offenses to have any tendency in reason to show he was predisposed to commit the charged offense.  (Evid. Code, § 1108.)  He also argues that some of the prior crimes evidence was highly inflammatory and unduly prejudicial.  (Evid. Code, § 352.)  We reject these claims.

1. Background

In the first and third trials, Doreen H. testified that in May 1992, defendant exposed his penis to her on a Rialto street, grabbed her breasts, and tried to pull her into some nearby bushes. In the first trial, Katheen L. testified that in 2001, defendant grabbed her breast in his van after she accepted his offer of a ride home. She told him to stop but he did not. After she threatened to stab him with a screwdriver, defendant stopped touching her and apologized. He took her home and kissed her on the forehead as he helped her out of his van. Kathleen L.'s testimony from the first trial was read into the record in the third trial. In both trials, the parties stipulated that defendant admitted committing misdemeanor sexual battery on Doreen H. and felony sexual battery on Kathleen L.

In the third trial, the parties stipulated that defendant was convicted in the first trial in counts 3 through 6, the crimes involving Doe 2. Doe 2 also testified in the third trial concerning defendant's encounter with her, her brother, and her brother's friend at the Grant Elementary School playground in Riverside in May 2005. Doe 2 told the jury that defendant drove up in a van, threw rocks at Doe 2 and the boys to get their attention, and called to them to come over to him at the playground fence.

2. Analysis

In a criminal prosecution for a sex offense, evidence that the defendant committed other sex offenses is admissible to show that the defendant had a propensity to commit the charged offenses, unless the evidence is inadmissible under Evidence Code section

35

352. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911, 916; Evid. Code, § 1108.)[3]  Under

Evidence Code section 352, the court may, in its discretion, exclude evidence if its

probative value is substantially outweighed by the probability that its admission will,

among other things, create a substantial danger of undue prejudice, of confusing the

issues, or of misleading the jury.  (*People v. Falsetta, supra,* at p. 916.)

In considering the admissibility of uncharged sex offense evidence under Evidence

Code section 352, the court must engage in "a careful weighing process."  (*People v.

Falsetta, supra,* 21 Cal.4th at pp. 916-917.)  "Rather than admit or exclude every sex

offense a defendant commits, trial judges must consider such factors as its nature,

relevance, and possible remoteness, the degree of certainty of its commission and the

likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its

similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on

the defendant in defending against the uncharged offense, and the availability of less

prejudicial alternatives to its outright admission, such as admitting some but not all of the

defendant's other sex offenses, or excluding irrelevant though inflammatory details

surrounding the offense.  [Citations.]"  (*Id*. at p. 917.)

We review a trial court's admission of other sex crimes evidence under Evidence

Code sections 1108 and 352 for an abuse of discretion.  (*People v. Story* (2009) 45

_____

[3]  Evidence Code section 1108 provides:  "(a)  In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."

Cal.4th 1282, 1295.) The court's admission of the evidence will not be disturbed unless the court exercised its discretion "'"in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]'" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286.)

Defendant argues that the evidence of his uncharged offenses in the first and third trials was too remote in time and too dissimilar to the charged offenses in each trial to have any bearing on whether he was predisposed to commit the charged offenses. (*People v. Earle* (2009) 172 Cal.App.4th 372, 397-398 [dissimilarities between uncharged and charged sex offenses can *compel* exclusion of evidence of the uncharged offense when the uncharged offense has no tendency in reason to show the defendant was predisposed "to engage in conduct *of the type charged*."].) We disagree.

As discussed, in the first trial the court admitted the evidence of defendant's 1992 misdemeanor sexual battery of Doreen H. and his 2001 felony sexual battery of Kathleen L., to show that defendant was predisposed to commit the charged offenses against 16-year-old Doe 1 in February 2005, and 10-year-old Doe 2 in May 2005. In the third trial on counts 1 and 2, the crimes against Doe 1, the court again admitted the evidence of the 1992 and 2001 offenses, together with the evidence of defendant's conviction in the first trial of the May 2005 attempted kidnapping and attempted lewd act on Doe 2, to show that defendant was predisposed to kidnap and rape Doe 1 in February 2005.

As defendant points out, the 1992 and 2001 offenses involved his nonconsensual touching, over clothing, of the breasts of two adult women in their 40's. The 1992

37

offense also involved him "flashing" and exposing his penis to Doreen H. on a public sidewalk, and his attempt to push her into some nearby bushes. In contrast, the charged offenses in the first and third trials involved 10- and 16-year-old victims, and were committed several years after the 1992 and 2001 offenses. In addition, the charged offenses against the young victims, Doe 1 and Doe 2, involved "far more serious" conduct than the 1992 and 2001 sexual battery offenses. And arguably, the charged offenses against Doe 1, kidnapping for rape and rape in concert, were more serious than the attempted kidnapping for rape, etc., and attempted lewd act on Doe 2, if only because defendant did not succeed in luring Doe 2 into his van.

Notwithstanding the noted dissimilarities between the uncharged and charged offenses, the evidence of the uncharged offenses in each trial had a strong tendency in reason to show that defendant was predisposed to commit the charged offenses. (Evid. Code, § 1108.) Indeed, the 1992, 2001, and 2005 incidents shared many similarities— enough to override their dissimilarities. In each case, defendant approached female victims who were complete strangers to him, in public places, in broad daylight. And in the 2001 and 2005 incidents, he used or attempted to use a van to commit the offenses.

Moreover, even though the victims of the 2005 charged offenses were much younger than the adult victims of the 1992 and 2001 offenses, each offense in light of the others had a very strong tendency in reason to show that defendant was predisposed to commit *increasingly* serious and aggressive sex offenses against *increasingly* vulnerable

38

and younger victims. In this light, the uncharged offense evidence admitted in each trial was highly probative of defendant's predisposition to commit the charged offenses.

Given these circumstances, the relative remoteness of the 1992 and 2001 offenses to the 2005 offenses was not dispositive of the probative value or admissibility of the older offenses on the issue of defendant's propensity to commit the 2005 offenses. (See *People v. Soto* (1998) 64 Cal.App.4th 966, 991 [passage of time does not render uncharged sex offenses irrelevant to propensity, when the uncharged and charged incidents share substantial similarities].) In addition, the probative value of the uncharged crimes evidence in each trial was further enhanced because each crime had a separate victim, and each victim provided an independent source of evidence for each offense. (*People v. Falsetta, supra,* 21 Cal.4th at p. 917.)

The uncharged crimes evidence also presented a minimal risk of undue prejudice and of confusing the jury—certainly not enough risk to substantially outweigh the probative value of the uncharged crimes evidence on the issue of defendant's disposition to commit the charged offenses. (Evid. Code, §§ 352, 1108.) In the first and third trials, the juries heard that defendant was both convicted of and punished for the uncharged offenses. Thus it is unlikely that either jury inappropriately punished defendant based on the evidence of the uncharged offenses. (*People v. Lewis, supra,* 46 Cal.4th at p. 1287; *People v. Scott, supra,* 52 Cal.4th at p. 491.) The uncharged offense evidence presented in each trial was far less egregious and inflammatory, or likely to evoke an emotional response from the jury, than the evidence of the charged crimes in each trial.

Accordingly, defendant's reliance on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*) is entirely misplaced. The defendant in *Harris* was a mental health worker who was charged with sex offenses involving his licking and fondling of two women who were vulnerable due to their mental health conditions. (*Id*. at pp. 730-731.) The trial court admitted evidence that, some 23 years before the defendant allegedly committed the charged offenses, he viciously bloodied, beat unconscious, and raped a woman who was "a stranger" to him. (*Id*. at pp. 733-735, 738.) To make matters worse, the jury heard an incomplete version of the prior crime which, the *Harris* court observed, "must have caused a great deal of speculation as to the true nature of the crime." (*Id*. at pp. 733-736, 738.) In fact, the prior crime was far more egregious than the jury heard. In addition, the jury was told that the defendant was convicted of burglary with the infliction of great bodily injury for the prior crime, *but not rape*. (*Id*. at p. 738.)

The *Harris* court concluded that the admission of the prior crime evidence was a miscarriage of justice (Cal. Const., art. VI, § 13), given that the prior crime evidence was "remote, inflammatory and nearly irrelevant and likely to confuse the jury and distract it from the consideration of the charged offenses." (*Harris, supra,* 60 Cal.App.4th at p. 741.) The court described the evidence of the prior crime as "inflammatory *in the extreme*," and of a "significantly different nature and quality" than the charged offenses. (*Id*. at p. 738.) Plainly, *Harris* does not assist defendant's argument. None of the uncharged crimes evidence presented here was too remote in time, inflammatory, likely

to confuse the jury, or distract the jury from considering the charged offenses in either trial.

We also reject defendant's additional claim that the admission of the uncharged crimes evidence violated his due process right to a fair trial, given that the court did not abuse its discretion in admitting any of the prior crimes evidence, and "'[t]he "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." [Citation.]'" (*People v. Lewis, supra,* 46 Cal.4th at p. 1289.)

Finally, any error in admitting any of the prior crimes evidence did not result in a miscarriage of justice; it was necessarily harmless. Given the strength of Doe 1's and Doe 2's testimonies that defendant committed each charged offense, there is no reasonable probability that defendant would have realized a more favorable result had the uncharged crimes evidence not been admitted in the first or third trials. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Harris, supra,* 60 Cal.App.4th at p. 741.)

Defendant's defense to the charged crimes involving Doe 1 was identity. He claimed he was not the person who abducted and raped Doe 1 in February 2005. But Doe 1 identified defendant as her assailant in a photographic police lineup shortly after her abduction and rape, and also identified him as her assailant at trial. In addition to Doe 1's identifications of defendant, circumstantial evidence showed that defendant was the person who abducted and raped Doe 1 in the white van.

Doe 2 also identified defendant in court as the man who approached her, her brother, and her brother's friend on the Grant Elementary School playground and offered

41

them a ride in his van. Multiple witnesses corroborated Doe 2's testimony. And in the first trial, the evidence that defendant abducted Doe 1 in February 2005 was admitted to show that defendant intended to abduct Doe 2 for the purpose of raping or committing a lewd act on her when he approached her in May 2005. (Evid. Code, § 1101, subd. (b).)

D. *CALCRIM No. 1191 Did Not Violate Defendant's Due Process Rights*

In the first and third trials, the juries were instructed to consider the evidence of defendant's uncharged sex offenses pursuant to the 2008 version of CALCRIM No. 1191 (Evidence of Uncharged Sex Offense).[4] He claims that the instruction violated his due process right to have the juries determine his guilt of the charged crimes based on proof

---

[4] In the first trial, the jury was instructed as follows: "The People presented evidence that the defendant committed the crimes of sexual battery that were not charged in this case. These crimes are defined for you in these instructions. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit rape, attempted rape, or attempted lewd and lascivious conduct, as charged here. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of rape, attempted rape, and attempted lewd and lascivious conduct. The People must still prove each element of every charge beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose except as you have otherwise been instructed." In the third trial, the jury received substantially the same instruction, except that the court added attempted kidnapping for child molestation as one of the listed, uncharged offenses in the first sentence, and the last sentence was changed to read: "Do not consider this evidence for any other purpose."

beyond a reasonable doubt.  He acknowledges he is raising the claim in order to preserve it for federal review.

As defendant acknowledges, the California Supreme Court rejected the same due process argument he raises here in *People v. Reliford* (2003) 29 Cal.4th 1007 (*Reliford*). The court there concluded that the language of former CALJIC No. 2.50.01, the predecessor to CALCRIM No. 1191, was not likely to mislead the jury concerning its use of uncharged crimes evidence in determining whether the prosecution met its burden of proving the elements of the charged crimes beyond a reasonable doubt.  (*Reliford, supra,* at pp. 1012-1016.)

Following *Reliford*, the courts in *People v. Schnabel* (2007) 150 Cal.App.4th 83 and *People v. Cromp* (2007) 153 Cal.App.4th 476 concluded that the 2006 version of CALCRIM No. 1191 was likewise not likely to mislead the jury concerning its duty to determine the defendant's guilt of the charged crimes beyond a reasonable doubt—given that there was "no material difference" between the language of former CALJIC No. 2.50.01 and the language of the 2006 version of CALCRIM No. 1191.  (*People v. Schnabel, supra,* at p. 87; *People v. Cromp, supra,* at pp. 479-480; see also *People v. Anderson* (2012) 208 Cal.App.4th 851, 894-896 [reaching the same conclusion concerning the 2008 version of CALCRIM No. 1191].)

Defendant effectively argues that *Reliford*, *Schnabel*, *Cromp*, and *Anderson* were incorrectly decided and that CALCRIM No. 1191 "deprived [him] of the presumption of innocence and a jury determination of proof of the elements of the charged sexual

43

offenses beyond a reasonable doubt." We disagree. As defendant acknowledges, we are bound by *Reliford* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456), and *Reliford* is controlling because there is no material difference between former CALJIC No. 2.50.01 and CALCRIM No. 1191.

E. *The Prosecutor Did Not Commit Misconduct in Failing to Instruct Witness Marlene Mitchell Not to Mention That Defendant Was a Sex Offense Registrant*

Defendant claims the prosecutor committed prejudicial misconduct under state law and the federal Constitution in failing to instruct witness Marlene Mitchell not to mention that defendant was required to register as a sex offender. We find no error, and further conclude that any error was harmless under any standard.

1. Background

Before the first trial, the court ordered both parties to admonish their witnesses not to refer to defendant's status as a sex offense registrant (§ 290) pending further order of the court. In cross-examining Marlene during the first trial, defense counsel sought to clarify whether she knew defendant had a sexual assault conviction when he first moved in with the Mitchell family. Marlene responded: "I did know . . . before he went to the Murrieta house. [¶] . . . [¶] . . . But I didn't know he had to register. . . . [¶] . . . [¶] . . . as a sex offender."

2. Analysis

"To constitute a violation of the federal Constitution, prosecutorial misconduct must "'so infect[] the trial with unfairness as to make the resulting conviction a denial of

44

due process."' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" [Citations.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 108.)

First, defendant has not established that the prosecutor failed to follow the court's order and did not tell Marlene not to mention that defendant was a sex offense registrant. (Cf. *People v. Parsons* (1984) 156 Cal.App.3d 1165, 1170-1171 [prosecutor engaged in misconduct by intentionally asking questions when he knew the answers were inadmissible].) After Marlene referred to defendant's status as a registered sex offender under cross-examination by defense counsel, counsel never sought to clarify whether the prosecutor failed to follow the court's order, or whether Marlene simply made the reference even though the prosecutor previously told her not to.

Defendant has thus forfeited his claim of prosecutorial error. (*People v. Stanley* (2006) 39 Cal.4th 913, 952.) "'[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (*Ibid.*; *People v. Dykes* (2009) 46 Cal.4th 731, 757.) Defendant claims that instructing the jury to disregard the reference would have been futile, but we disagree.

In any event, any error in failing to admonish Marlene not to refer to defendant's status as a sex offense registrant was harmless under any standard. (*Chapman v.*

45

*California* (1967) 386 U.S. 18, 24 [federal constitutional error requires reversal only when there is no reasonable possibility the error contributed to the verdicts]; *People v. Watson, supra,* 46 Cal.2d at p. 838 [state law error requires reversal only when it results in a miscarriage of justice, that is, when there is a reasonable probability the defendant would have realized a more favorable result absent the error].)

In our view, there is no reasonable possibility that the disclosure of defendant's sex registrant status affected the guilty verdicts in counts 3 through 6—the crimes for which he was convicted in the first trial. The jury in the first trial heard that defendant had two convictions for sexual battery convictions in 1992 and 2001. It is therefore unlikely the jury was surprised to hear that defendant was required to register as a sex offender, or that the disclosure in any way affected its verdicts.

Defendant only speculates that "the disclosure of the registration likely raised the specter in some jurors' minds of other convictions involving children." Indeed, the jury heard no evidence that defendant had any prior convictions involving children, or that persons who are required to register as sex offenders must have committed sex offenses against children.

Nor did the disclosure of the registration invite "rampant speculation" on the part of the jurors "as to whether [defendant] was prohibited from being so near school grounds and thus that he must have been motivated by an inappropriate sexual interest in children in order to risk a violation of the terms of his registration obligation." In any

event, the jury in the first trial had no cause to speculate about defendant's motivation or intent when he approached Doe 2 on the school playground.

The jury heard that defendant used a white van to abduct and rape 16-year-old Doe 1 only three months before he approached 10-year-old Doe 2 on the school playground and offered her a ride in a white van. This evidence, together with the evidence of defendant's prior sexual batteries against two adult women, strongly indicated that defendant *intended* to abduct and rape or at least commit a lewd act on Doe 2. In sum, based on the entire record, it is not reasonably possible that Marlene's disclosure of defendant's sex offender registration affected the verdicts in the first trial.

F. *No Prejudicial Ineffective Assistance of Counsel*

Defendant alternatively claims his trial counsel rendered ineffective assistance of counsel, in the event this court determines he failed to preserve for appeal any of his claims set forth in section B., C., D., or E.

To establish a claim of ineffective assistance of counsel, a criminal defendant must show that his or her attorney's representation fell below an objective standard of reasonableness, and the error resulted in prejudice, that is, there is a reasonable probability the defendant would have realized a more favorable result absent the error. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216.)

Here, there was no prejudicial ineffective assistance, given our conclusions that: (1) Dr. Rath's testimony was properly admitted; (2) the uncharged crimes evidence was

47

properly admitted in both trials under Evidence Code sections 352 and 1108; (3)

CALCRIM No. 1191 did not undermine the prosecution's burden of proof of the charged

crimes; and (4) any prosecutorial error in failing to admonish Marlene not to disclose his

sex offender registration was harmless beyond a reasonable doubt.

G. *The Error in the Rape in Concert Instructions Was Harmless*

Defendant claims the jury was erroneously instructed that it could find him guilty

of the rape in concert of Doe 1 as charged in count 2 (§ 264.1), if it found he

accomplished intercourse with Doe 1 by means of "force, violence, duress, menace, or

fear of immediate and unlawful bodily injury."  We agree that the jury was erroneously

instructed that rape in concert could be accomplished by "duress, menace, or fear," and

not solely by "force or violence" as section 264.1 requires.  We nonetheless conclude that

the instructional error was harmless beyond a reasonable doubt.  There was no evidence

that the rape in concert of Doe 1 was accomplished by any means other than force.  Thus

the jury must have found that defendant committed the rape in concert by means of force,

and not by duress, menace or fear.

1.  Background

Defendant was charged with the rape in concert of Doe 1 in count 2.  (§ 264.1.)[5]

Rape in concert requires intercourse with the victim by "*force or violence* and against the

---

**5**  Section 264.1 states, in part:  [I]n any case in which the defendant, voluntarily acting in concert with another person, by force or violence and against the will of the victim, committed an act described in Section 261 [rape], 262 [rape of a spouse], or 289 [penetration by foreign object], either personally or by aiding and abetting the other

*[footnote continued on next page]*

48

will of the victim." (*Ibid.,* italics added; see *People v. Mom* (2000) 80 Cal.App.4th 1217, 1223, disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 1015, 1028.) By contrast, forcible rape, defined in section 261, subdivision (a)(2), can be accomplished against a person's will by means other than force or violence, namely, "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2); *In re Jose M.* (1994) 21 Cal.App.4th 1470, 1477.)

The jury was instructed on rape in concert pursuant to CALCRIM Nos. 1001 (Rape or Spousal Rape in Concert (Pen. Code, § 264.1)) and 1000 (Rape or Spousal Rape by Force, Fear, or Threats (Pen. Code, § 261(a)(2), (6) & (7)). CALCRIM No. 1001 told the jury it could only find defendant guilty of rape in concert if it found he had intercourse with Doe 1 by means of force or violence. But CALCRIM No. 1000 inconsistently told the jury it could find defendant guilty of rape in concert if it found he had intercourse with Doe 1 by means other than force, violence, duress, menace, or fear.[6]

---

*[footnote continued from previous page]*
person, . . . the defendant shall suffer confinement in the state prison for five, seven, or nine years."

[6] As given, CALCRIM No. 1001 told the jury: "The defendant is charged [in Count 2] with committing rape by acting in concert with the driver [in violation of Penal Code section 264.1]. [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. *The defendant personally committed forcible rape* and voluntarily acted with someone else who aided and abetted its commission. [¶] To decide whether the defendant committed rape, please refer to the separate instructions that I will give you on that crime. To decide whether the defendant or the driver aided and abetted rape, please refer to the separate instructions that I will give you on aiding and abetting. You must apply those instructions when you decide whether the People have proved rape in concert. . . ." (Italics added.)

*[footnote continued on next page]*

2. <u>Analysis</u>

We agree with defendant that the jury was erroneously instructed that it could find him guilty of rape in concert by means *other than* force or violence, namely, duress, menace, or fear of injury. (§ 264.1; *In re Jose M., supra,* 21 Cal.App.4th at p. 1477 [rape in concert requires intercourse by "force or violence"].) Nonetheless, in view of the entire record, including the evidence, instructions, and arguments of counsel, the instructional error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24; *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 ["Harmless-error review looks . . . to the basis on which 'the jury *actually rested* its verdict.'"]; *People v. Lewis* (2006) 139 Cal.App.4th 874, 884-890 ["there is no reasonable possibility that the error might have contributed to the conviction in this case."].) The jury could not possibly have found defendant guilty of rape in concert in count 2 based on anything other than his personal use of force against Doe 1.

First, CALCRIM No. 1001 told the jury that it had to find that defendant "personally committed *forcible* rape" in order to find him guilty of rape in concert.

---

*[footnote continued from previous page]*

Following CALCRIM No. 1001, the jury was given CALCRIM No. 1000, which instructed, in part: "To prove that the defendant is guilty of rape by force or fear, the People must prove that: [¶] 1. The defendant had sexual intercourse with a woman; [¶] 2. He and the woman were not married to each other at the time of the intercourse; [¶] 3. The woman did not consent to the intercourse; [¶] AND [¶] 4. *The defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else.* [¶] Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis. [Ejaculation is not required.]" (Italics added.)

50

(Italics added.) Moreover, there was *no evidence* that defendant raped Doe 1 by any means other than by force, including by duress, menace, or fear of injury. The evidence showed that defendant grabbed Doe 1 as she was walking near her school, and forced her into the back of a van. He pinned her down and held her hands over her head as she screamed. He removed her pants and put his penis inside her vagina as she continued screaming. Doe 1 escaped from the van after kicking defendant. There was no evidence that defendant verbally threatened Doe 1 at any time, or in any way indicated that he would injure her or another person if she resisted the rape. Thus, force was the only means used to accomplish the rape, and the only basis upon which the jury could have found defendant guilty of rape in concert. Indeed, the prosecutor argued only that force was used, and the defense was solely one of mistaken identity.

## H. *Defendant's Marsden[7] Motion Following the Third Trial Was Properly Denied*

Following the third trial on counts 1 and 2, defendant filed a *Marsden* motion, together with a motion for a new trial. In the *Marsden* motion, defendant claimed the attorney who represented him during the third trial, Patrick Rossetti, rendered ineffective assistance, and asked the court to appoint new counsel to assist him in filing an amended motion for a new trial, elaborating on the reasons Attorney Rossetti rendered ineffective assistance during the third trial. The court denied the *Marsden* motion following a hearing in chambers with defendant and Attorney Rossetti. Defendant claims the court abused its discretion in denying the motion. We find no abuse of discretion.

---

[7] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

51

1.  Background/The Posttrial *Marsden* Motion

In his *Marsden* motion, defendant claimed Attorney Rossetti rendered ineffective assistance of counsel in the third trial by: (1) failing to procure DNA testing on the vaginal swabs from Doe 1's SART exam; (2) failing to procure DNA testing on the hairs found on Doe 1's clothing; (3) failing to present testimony from a cognitive memory expert to rebut Doe 1's identification of him; (4) failing to present the testimony of an expert barber concerning hair growth rates; and (5) failing to locate William Mitchell and call him to testify in the third trial concerning both the length and color of defendant's hair in February 2005 and defendant's lack of access to a white van of the type described by Doe 1.

At the hearing on the motion, defendant elaborated on the basis of the motion and his ineffective assistance of counsel claim. Defendant complained that he was absent without his consent at two pretrial motion hearings, and that Attorney Rossetti also rendered ineffective assistance in failing to object to Marlene's testimony that defendant had an affinity for the orange groves near Van Buren Boulevard where Doe 1 was taken and raped. Defendant claimed he had never been to the orange groves where Doe 1 was raped.

In response, Attorney Rossetti told the court that his defense investigator, Randall Hecht, had been unable to locate William despite repeated attempts to do so before the third trial began. In any event, counsel believed that even if William had been called to

testify, he likely would have invoked his right against self-incrimination, given that the prosecution suspected him of driving the van while defendant raped Doe 1.

Regarding Marlene's testimony that defendant had an affinity for the orange groves near where Doe 1 was raped, Attorney Rossetti told the court that the first time either he or the prosecution heard the statement was when Marlene testified. Counsel pointed out that Marlene said she told Mr. Smith, the defense investigator during the time defendant represented himself in the case, that defendant had an affinity for the orange groves, but Mr. Smith had not returned counsel's telephone calls, and there was no report in the file from Mr. Smith saying that Marlene did or did not make the statement.

Regarding defendant's absence at two pretrial hearings, counsel explained that the case was assigned to Indio for a trial on the last day (or very shortly) before defendant's speedy trial waiver expired, and defendant agreed to put the matter over for a couple more days. Before jury selection began, two Evidence Code section 402 hearings were held and defendant was not present at the hearings. The court told defendant that "[a]nything of significance" would have been put on the record, not discussed solely in chambers among the court and trial counsel.

Regarding his failure to procure exculpatory DNA evidence, counsel explained that the People tested the nonmobile sperm on the vaginal swab taken from Doe 1 and also tested the hair follicle found on Doe 1's clothing, and the tests were inconclusive. This was favorable to the defense, and at trial counsel argued there was no DNA evidence connecting the nonmobile sperm or hair follicles to defendant.

53

In addition, the criminalist testified that he did not conduct DNA testing on the hairs taken from Doe 1's clothing either because the hairs had no roots or the roots were of insufficient grade for DNA analysis. Also, there were no signs of sperm cells or seminal fluid on the vaginal swabs taken from Doe 1, so there was no material on the swabs to conduct DNA testing. The absence of seminal fluid was consistent with the perpetrator not ejaculating.

Regarding the length and color of defendant's hair at the time of the rape, Attorney Rossetti pointed out that he presented several photographs showing defendant with different hair lengths, and argued that the discrepancies in hair lengths weighed against Doe 1's identity of defendant as her rapist. At trial, Doe 1 testified that defendant had blonde, close-cut hair at the time of the February 18, 2005, rape, but photographs of defendant taken in May 2005 showed he had long, gray hair.

At the conclusion of the hearing, the court ruled that defendant had not met his burden of showing a substantial impairment of his right to effective assistance of counsel during the third trial. To the contrary, the court noted that defendant had "outstanding representation."

2. Analysis

A criminal defendant is entitled to competent representation at all times, including in making a motion for a new trial. (*People v. Smith* (1993) 6 Cal.4th 684, 695.) If the defendant cannot afford to hire an attorney, one must be appointed for him. (*Gideon v. Wainwright* (1963) 372 U.S. 335, 343-344.)

54

In a *Marsden* motion, an indigent criminal defendant asks the court to appoint new counsel in place of the defendant's existing appointed counsel. (*People v. Smith, supra,* 6 Cal.4th at p. 690; *Marsden, supra,* 2 Cal.3d at p. 123.) The decision whether to grant or deny a *Marsden* motion lies within the discretion of the trial court. (*People v. Clark* (2011) 52 Cal.4th 856, 912; *Marsden, supra,* at p. 123.)

The denial of a *Marsden* motion will not be an abuse of discretion, "'"'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.'" [Citations.] Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when "the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." [Citations.]' [Citation.]" (*People v. Myles* (2012) 53 Cal.4th 1181, 1207.)

When a defendant asks the court to appoint new counsel for purposes of preparing a new trial motion based on ineffective assistance of counsel, the court must conduct a hearing to explore the reasons for the request. (*People v. Diaz* (1992) 3 Cal.4th 495, 573-574.) "If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a 'colorable claim' of inadequacy of counsel, then the trial court

may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial. [Citations.]" (*Id*. at p. 574.)

Defendant argues the trial court abused its discretion in denying his *Marsden* motion because it "ignored the deficiencies in . . . counsel's performance and effectively held an abbreviated hearing on [the] new trial motion which it denied. The result was to deprive [defendant] of independent counsel to investigate and expound upon his claim of ineffective assistance of counsel." The claim is without merit.

The *Marsden* motion was properly denied, and the new trial motion was properly and expeditiously resolved against defendant at the time the *Marsden* motion was denied. (*People v. Smith, supra,* 6 Cal.4th at p. 696; *People v. Diaz, supra,* 3 Cal.4th at pp. 573-574.) Defendant made no showing that the failure to replace Attorney Rossetti would substantially impair his right to effective assistance of counsel for the purpose of further investigating or "elaborating" upon his ineffective assistance claim, and amending his motion for a new trial based on ineffective assistance.

At the hearing, the court thoroughly explored each of the grounds upon which defendant was claiming that Attorney Rossetti rendered ineffective assistance of counsel during the third trial. Each ground was based on events that occurred in the courtroom, or that Attorney Rossetti explained in response to defendant's complaints. Based on the record of the proceedings, defendant's complaints, and Attorney Rossetti's explanations, the court reasonably concluded that defendant did not state a "colorable claim" of

56

ineffective assistance and that appointing new counsel to investigate the claim would not aid the claim in any respect.  (*People v. Diaz, supra,* 3 Cal.4th at p. 574.)

I.  *The Denial of the Marsden Motion Did Not Violate Defendant's Right to Counsel*

Defendant also claims that the court's denial of his *Marsden* motion violated his right to counsel under the state and federal Constitutions.  The denial of a *Marsden* motion implicates the defendant's right to counsel.  (*People v. Abilez* (2007) 41 Cal.4th 472, 490.)  On direct review of the refusal to substitute counsel, courts consider three factors:  "'''(1) timeliness of the motion; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense.'"  [Citations.]'"  (*Ibid.*)

In the present case, defendant raises no question concerning the timeliness of the *Marsden* motion or the adequacy of the court's inquiry concerning the bases of defendant's ineffective assistance claim.  Instead, he argues that the "conflict" between himself and Attorney Rossetti was so great that it resulted in the total "breakdown" of the attorney-client relationship, and the court's failure "to recognize the irreconcilable conflict" and grant the motion violated his state and federal constitutional rights to effective representation of counsel.  Again, we disagree.

A defendant may not force the substitution of counsel by his own conduct that purports to manufacture a conflict of interest.  (*People v. Smith, supra,* 6 Cal.4th at pp. 696-697, citing *People v. Hardy* (1992) 2 Cal.4th 86, 138.)  Nor was there any indication

57

that defendant and Attorney Rossetti were unable to communicate, or that Attorney Rossetti was unable to adequately represent defendant in any subsequent proceedings, including sentencing. (*People v. Smith* (2003) 30 Cal.4th 581, 606 ["Defendant did not show that defense counsel did anything to cause any breakdown in [the attorney-client] relationship"].)

J. *The 15-year-to-life Sentence on Count 2 Under the One Strike Law (§ 667.61) Was Properly Imposed*

Defendant claims he was erroneously sentenced to 15 years to life for the rape in concert of Doe 1 in count 2 under the enhanced sentencing provisions of the One Strike law (§ 667.61) because the jury did not expressly find true any allegation that the rape in concert was committed under any of the circumstances described in subdivision (e) of section 667.61.

Subdivision (b) of section 667.61 provides, in pertinent part, that: "[A]ny person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 15 years to life." Rape in concert (§ 264.1) is an offense specified in subdivision (c)(3) of section 667.61, and kidnapping "the victim" in violation of section 207, 209, or 209.5 is a circumstance specified in subdivision (e)(1) of section 667.61.

The circumstances specified in subdivisions (d) and (e) of section 667.61 must be alleged in the accusatory pleading and found true by the trier of fact. (*People v. Mancebo* (2002) 27 Cal.4th 735, 743-745; former § 667.61, subd. (i).) When the crimes were

committed in February 2005, the statute provided that "'[f]or the penalties provided in this section to apply, the existence of any fact required under subdivision (d) or (e) *shall be alleged in the accusatory pleading* and either admitted by the defendant in open court or found to be true by the trier of fact.'" (*People v. Mancebo, supra,* at p. 743; former § 667.61, subd. (i).)

The last sentence of the operative amended information stated: "The District Attorney of the County of Riverside further charges that in connection with the commission of the above offense the defendant . . . kidnapped the victim in violation of Penal Code sections 207, 209, and 209.5, within the meaning of Penal Code section 667.61, subdivision (e), subsection (1)." The jury found defendant guilty of kidnapping Doe 1 to commit rape, etc. (§ 209, subd. (b)(1); count 1) and of the rape in concert of Doe 1 (§ 264.1; count 2), but the jury was not given and did not return a special verdict finding any kidnapping *allegation* true within the meaning of section 667.61, subdivision (e)(1).

Defendant claims the jury's guilty verdicts in counts 1 and 2 are insufficient to qualify him for a 15-year-to-life sentence under the One Strike law. (§ 667.61, subds. (b), (c)(3), (e)(1).) Instead, he claims his 15-year-to-life sentence on count 2 is unauthorized because the jury did not return a special verdict finding he kidnapped Doe 1 within the meaning of either section 207, 209, or 209.5, "within the meaning of Penal Code section 667.61, subdivision (e), subsection (1)." We disagree.

59

Defendant relies on *Mancebo,* but the decision does not support his argument. As pertinent, the court in *Mancebo* concluded that, under subdivision (f) and former subdivision (i) of section 667.61, the circumstances qualifying a defendant for sentencing under the One Strike law must be alleged in the accusatory pleading and found true by the trier of fact. (*People v. Mancebo, supra,* 27 Cal.4th at pp. 743-745.) Thus, in *Mancebo*, the trial court had no authority to substitute a multiple victim circumstance finding, which was neither pleaded nor found true by the jury, for a gun use circumstance as the basis for imposing defendant's One Strike sentence. The *Mancebo* court explained: "[N]o factual allegation in the information or pleading in the statutory language informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing . . . ." (*Id*. at p. 745; see *People v. Woodward* (2011) 196 Cal.App.4th 1143, 1151 ["the pleading was sufficient to invoke the application of the One Strike Law"].)

Unlike the unpleaded multiple victim circumstance allegation in *Mancebo*, the information in the present case effectively informed defendant that in the event he was convicted in counts 1 and 2, his kidnapping conviction in count 1 would qualify him for a 15-year-to-life sentence on count 2. Nothing in section 667.61 requires the trier of fact to return a special verdict finding the defendant eligible for a One Strike sentence on any ground, particularly when, as here, the accusatory pleading puts the defendant on notice of the basis of the defendant's eligibility for a One Strike sentence, and the jury effectively finds the alleged circumstance true in a guilty verdict.

60

Further, any sentencing error based on the jury's failure to return a special verdict on the kidnapping circumstance allegation was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.)  In view of the evidence of how the crimes in counts 1 and 2 were committed, and the jury's guilty verdicts in counts 1 and 2, the jury necessarily found that defendant raped Doe 1 in concert with another *under the circumstance* or during the commission of kidnapping Doe 1.  Indeed, the jury could not possibly have found that the rape in concert of Doe 1 did not occur under the circumstance of the kidnapping.  (See *People v. Luna* (2012) 209 Cal.App.4th 460, 468 [any error in failing to instruct the jury to find that the victim was raped during the commission of a kidnapping, or vice versa, was harmless beyond a reasonable doubt because the jury expressly found that the rape occurred during the commission of a kidnapping, and the evidence overwhelmingly supported the finding].)

K.  *The $70 Fine and Presentence Custody Credits*

Defendant raises two claims of sentencing error which the People concede.  We agree that both claims have merit.

First, the parties and this court agree that a $70 fine was erroneously imposed pursuant to section 264, subdivision (b) and must be stricken.  The statute authorizes the trial court to impose a fine not to exceed $70 against any person who violates section 261 or 262.  (§ 264, subd. (b).)  Defendant was not convicted of violating section 261 or 262, but was instead convicted of rape in concert in violation of section 264.1 after the information was amended to allege rape in concert rather than forcible rape in violation

of section 261.  Accordingly, the $70 fine was erroneously imposed and must be stricken from the judgment.

Second, the court erroneously omitted to award defendant any presentence custody credits.  Defendant claims, and the People agree, that defendant is entitled to 2,301 days of actual custody credits, plus 345 days of good conduct credit, for a total of 2,646 days of presentence custody credits.  (§§ 2900.5, 2933.1.)  A sentence that fails to award mandatory custody credits is unauthorized and may be corrected at any time.  (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)  We amend the judgment accordingly, and order the abstract of judgment amended to reflect an award of 2,646 days of presentence custody credits.

## IV.  DISPOSITION

The $70 section 264, subdivision (b) fine is stricken, and the judgment is further amended to include an award of 2,301 days of custody credits, plus 345 days of good conduct credits, for a total of 2,646 days of presentence custody credits.  (§§ 2900.5, 2933.1.)  The matter is remanded to the trial court with directions to prepare an amended abstract of judgment reflecting these amendments to the sentence and judgment, and to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment is affirmed in all other respects.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
Acting P. J.

We concur:

MILLER
J.

CODRINGTON
J.